UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――

UNITED STATES OF AMERICA.

-v-                                           Docket NO: 5:11CR00125-001

MICAH BROWN

                 Defendant.
―――――――――――――――――――――――――

## SENTENCING MEMORANDUM

DATED: August 9, 2011                 Respectfully submitted,
                                                       Syracuse, New York

                                                       Bianco Law Office

                                 By: *[signature]*

                                                       Randi Juda Bianco, Esq.
                                                       247 West Fayette Street
                                                       Suite 202
                                                       Syracuse, New York 13202
                                                       Phone: (315) 424-0744
                                                       Bar Roll # 507514

## PRELIMINARY STATEMENT

On April 20, 2011 Micah Brown entered a plea of guilty to a single count information charging him with coercion or enticement of a minor in violation of 18 § USC 2422(b). A Pre-Sentence Investigation Report (hereinafter referred to as Report) has been prepared by the United States Department of Probation in anticipation of his sentencing. The Report recommends an advisory United States Sentencing Guideline Range of 292 to 365 months of imprisonment, based upon a Criminal History Category of I and an advisory Guideline offense level of 40.

Counsel asks this Court to depart downward from the guidelines and impose a non-guideline sentence as a result of Mr. Brown's (hereinafter "Micah") extraordinary physical impairment under USSG § 5K2.22(2) and USSG § 5H1.4 as well as the factors set forth in 18 USC § 3553(a).

## 18 U.S.C. § 3553(a); USSG § 5K2.22(2) and USSG § 5H1.4 Factors

This case presents several compelling mitigating factors which this Court should consider in order to determine a just sentence. Micah's personal circumstances outweigh the application of the advisory range of imprisonment contained in the Guidelines for the typical case. As will be demonstrated, Micah's physical disabilities and social awkwardness will make the time spent in prison much more difficult for him than the average prisoner. Micah will be subjected to an isolation and loneliness never contemplated by the sentencing guidelines and for this reason the Court should sentence him to the mandatory minimum of 10 years plus 5 years post-release supervision.

### *A. BACKGROUND AND CHARACTERISTICS OF MICAH BROWN*

#### i) Physical disabilities

Micah has longstanding physical disabilities. He was born prematurely and spent the first six weeks of his life in ICU. By the time he was two he had four surgeries and his early years were marked by numerous medical problems which resulted in severe developmental delays. "Micah had many health problems from the moment of his early and difficult birth. His family made enormous sacrifices and pulled him through some very trying times. For the first few years of his life, he wasn't

able to speak, and breathed through a tube in his throat which had to be constantly tended" (see attached Exhibit #9, Letter of **Jerome P. Rainey**, Uncle). At present Micah suffers from profound deafness, has permanent heart problems, Cerebral Palsy, Noonan Syndrome and a severe bleeding disorder which prevents his blood from clotting (see attached Exhibit #1, "Summary of Medical Conditions for Micah Saul Brown, DOB 4/2/1980", and supporting medical records). Due to the genetic disorder of Noonan's syndrome, Micah, "has a misshapen physical appearance that causes abnormal development of multiple body parts, which in his case includes short stature, a short broad neck, distinct facial features, and rotated ears" (See Presentence Investigation Report by Janna A Kulakowski, U.S. Probation Officer, dated August 3, 2011, at page 17). Micah's physical impairments will no doubt impact his ability to function in prison, making even the mandatory minimum sentence of ten years more difficult and punitive than a much longer sentence for a healthy person.

### ii) Supportive Family

Micah has an incredibly supportive family as demonstrated by the multiple letters of his Father, Mother, Sister, Aunts, Uncles and Family Friends that have been submitted with this memorandum. "He will always have the support of his two loving, caring parents as well as his family" (see attached Exhibit #6, Letter of **Ellen Brown**, Aunt). "I appeal to you to please let [Micah] come back to his large and loving family soon. We are not complete without him" (see attached Exhibit #12, Letter of **Joan Rainey**, Mother).

### iii) Social Awkwardness

Micah has rarely been accepted socially due to his deafness and distinct physical appearance. "Micah's hearing loss, Aspberger's syndrome, and other disabilities have combined to prevent him from learning social function in normal situations" (see attached Exhibit # 4, Letter of **Ruth Finnegan**, Aunt). "Micah's lack of 'social graces' became very apparent when he got to Gallaudet. He came off to my friends not necessarily as 'weird', but as dismissive and rude in basic

2

social situations which resulted in the folks in my social circle not liking him very much..." (see attached Exhibit # 8, Letter of **Melissa Foote**, Deaf Friend). **Mary Jo Marshall**, Teacher, "described Micah as struggling with group interactions because he was unable due to his deafness to know when it was appropriate to insert himself into a conversation. She explained that he would be able to follow the cues of the kid in front of him, but if someone else in the group was talking and Micah wasn't watching them he would frequently interrupt, which frustrated the other kids....Ms. Marshall said that she had seen Micah crying about his social difficulties and being left out of things by other kids...." (see attached Exhibit #7, Affidavit of Mark Robertson Regarding Statement of **Mary Jo Marshall**). "[Micah] didn't seem to know how to transition to a new topic or ask me an open-ended question...or even to wait for me or someone else to lead the conversation in a new direction.... [H]e would wander off, and that would be the end of the conversation.... [O]nce he was done with his regular routine, he didn't seem to know what to do next on his own....I have often [thought] about how hard it must be for Micah to interact with non-family members who do not have the patience that we do" (see attached Exhibit #5, Letter of **Emily Rainey**, Aunt).

Certainly the prison population will be even less patient or compassionate towards Micah than society at large. This will make the time he spends incarcerated that much more difficult. In fact, Micah has already been the subject of ridicule while in custody being verbally abused and being called various names such as "freak" and the like.

### iv) Isolation From His Family Led Him to Try to Meet People on the Internet

In 2009, Micah decided to return to school because he was frustrated with the lack of job opportunities available for him. He applied and was accepted to several schools; however the Rochester Institute of Technology (RIT) offered the most comprehensive package. Consequently, Micah chose RIT and he started school in August 2009. During the spring 2010 semester, Micah was required to complete a student teaching assignment as part of the teaching program. He chose the American School for the Deaf in Connecticut. In exchange for on-campus housing, Micah provided

3

tutoring services for students in the library. It was while teaching at the American School that Micah was arrested for the present offense.

When Micah was at school and far from his immediate family, he found himself very isolated and alone. Growing up deaf with a number of physical disabilities and deformities, he often found it difficult to meet new people and be accepted by them. "While he has had some good and strong friendships, mainly with other deaf children, he's had a hard time finding companionship and closeness with others that many of us might take for granted" (see attached Exhibit # 13, Letter of **Caroline Skinner**, Family Friend). With the internet, the deaf and disabled are on equal footing with other non-handicapped people who want social interaction. The internet, "offered a means of communication—chats and emails—that was not hampered by the complicatedness of being deaf..." (see attached Exhibit # 8, Letter of **Melissa Marshall-Foote**, Deaf Friend). "When you are deaf, you rely a lot on the internet for communication. I am not excusing what Micah did, but I think this is what happened to Micah. His world became an 'internet world'" (see attached Exhibit #11, Letter of **Sophie-Shifra Gold**, Deaf Friend).

What began as an attempt to make new friends to ease his isolation, turned into something unexpected. What began as purely a friendship with V-1 escalated into an unlawful and inappropriate relationship. Micah acknowledges that what he did was wrong and that he should have drawn the line at the friendship level.

### B. MICAH WILL EXPERIENCE AN ISOLATION MORE EXTRAORDINARY THAN THE TYPICAL INMATE

As this court is aware, a prison sentence for a person convicted of a sexual offense (especially one against a child) imposes a type of social isolation from the rest of the prison population. Due to Micah's disabilities, that isolation will be magnified ten-fold. The effects of Micah's incarceration have already manifested themselves in the past 15 months. Since his incarceration, Micah has lost over 60lbs and now weighs approximately 120lbs. As noted by the

4

persons who know Micah best, "Micah will have an extremely difficult time in prison, much more so than others. Given his deafness, Micah is already socially isolated. He will not be able to communicate easily with others....[In prison] Micah's world will be one of extreme social isolation" (see attached Exhibit #3, Letter of **Robert Brown**, Father). "Throughout his whole life, Micah's biggest goal has always been simply to be accepted. He has always tried harder than anyone else I've known to be included and connect with people. While his family accepts and loves Micah, unfortunately, his success in gaining acceptance in the outside hearing world has been limited" (see attached Exhibit #12, Letter of **Joan Rainey**, Mother). Each day in prison Micah will bear his own personal solitary confinement.

### i) Micah's deafness

Because he is deaf, Micah's life in prison will be radically more difficult than that of a typical inmate. Without an interpreter and other communications aids, Micah's safety could be jeopardized. He will be held in communication isolation. He will be deprived of meaningful access to education and treatment programs, disciplinary proceedings, religious services, and healthcare.[1] Deafness is one of the least understood and most debilitating disabilities in the prison context.[2]

Deaf prisoners cannot use a telephone to communicate with the outside world and therefore require access to telecommunication devices for deaf persons (TDDs or TTYs)[3] or other forms of

---

[1] Henri Cauvin, *Deaf Prisoner Files Rights-Violation Suit*, Washington Post, January 11, 2011 at B4; Carla K. Johnson, *Deaf Inmates Sue for Access to Interpreters*, Chicago Sun-Times (The Associated Press), May 6, 2011, *available at* http://www.suntimes.com/search/5227273-417/deaf-inmates-sue-for-access-to-interpreters.html

[2] McCay Vernon, *ADA Routinely Violated by Prisons in the Case of Deaf Prisoners*, Prison Legal News, July 23, 2011 *available at* https://www.prisonlegalnews.org/21430_displayArticle.aspx.

[3] Even when access to such devices is available, prisons sometimes limit TTY use to daytime hours, require appointments or requests, and do not permit adequate time to use the device, because conversations that are typed take longer than spoken ones. National Association for the Deaf, *Rights of Deaf and Hard of Hearing Inmates*, *available at* http://www.nad.org/issues/justice/jails-and-prisons/rights-deaf-inmates.

5

communication such as text messaging and email, which are not available to a prisoner.[4] Moreover, cultural differences between the deaf and hearing communities are vast, and miscommunications between hearing and deaf individuals are frequent and profound. "In an attempt to make themselves understood, deaf culture relies heavily on physical gestures. Unfortunately, these gestures are often misunderstood by the hearing world, or so culturally dissonant to the hearing world, that the deaf person is ostracized for them. " . . . "Deaf people routinely touch as a means of beginning a conversation. Tapping someone on the shoulder, waving, and/or banging on the furniture are all expected when trying to get someone's attention, but for hearing people this behavior can be disconcerting" (see attached Exhibit #2, Letter of **Joann Sullivan**, Certified American Sign Interpreter). In prison, these issues are exacerbated: deaf inmates cannot follow multiple conversations; face punishment for misunderstanding orders from correctional officers; cannot hear the chatter among inmates; cannot hear alarms and announcements; and are misunderstood when they try to speak.[5] Cut off from other inmates, unable to communicate with the outside world, and unable to access prison services, deaf inmates exist in profound isolation and suffer extreme difficulties in getting their most basic needs met.[6]

> "The deaf face a nightmare when they fall into the criminal justice system. They live in a world apart to begin with; but in prison they are thrown into a dread new environment where they literally can't understand the language of either their jailers or the other prisoners. When people who have never heard a spoken word try to speak, the sounds come out jumbled and weird—leading ill-informed jailers to think they are obstreperous or crazy" (*The Crime Report*, "The Secret World of Deaf Prisoners", September 29, 2009).

---

[4] For a deaf inmate, twitter, email, and text messaging are "lifesaving device[s] to communicate with the hearing world." James Ridgeway, *The Secret Life of Deaf Prisoners*, Mother Jones, Oct. 9, 2009 available at http://motherjones.com/mojo/2009/10/secret-world-deaf-prisoners-0
[5] James Ridgeway, *The Secret Life of Deaf Prisoners*, Mother Jones, Oct. 9, 2009 available at http://motherjones.com/mojo/2009/10/secret-world-deaf-prisoners-0
[6] Deaf prisoners are "cut off in a way that hearing prisoners, even in the most secure facilities, aren't." Henri Cauvin, *Deaf Prisoner Files Rights-Violation Suit*, Washington Post, January 11, 2011 at B4.

Likewise, Micah will not be able to pass the time by watching television since, as he currently experiences, many correctional officers and inmates do not allow Micah to turn on the "closed captions" option on the television so he can understand what is going on.

### ii) While in Prison Micah's Programming Options Will be Limited.

Due to Micah's deafness and the lack of individuals proficient is sign language, his programming options will be limited. Indeed, the subject of providing accommodations to the deaf in federal institutions is the focus of a now pending federal lawsuit against Butner FCI. See *Heyer v. United States Bureau of Prisons, et al.*, Civil Action No. 5:11-cv-3118-D (E.D. N.Car., Raleigh Div.) Complaint filed June 20, 2011.

### iii) Micah's disabilities will all but preclude him from participating in any physical activities.

While most inmates will spend their free time (when not engaged in work or programming) participating in physical activities, Micah will not have such diversions. Due to his blood clotting disorder, it is not safe for Mr. Brown to engage in most types of physical activities because if injured he could be in a very real life threatening situation (see attached Exhibit #1 at pages 2-3, "Summary of Medical Conditions for Micah Saul Brown, DOB 4/2/1980", and supporting medical records).

### iv) Micah will be a vulnerable victim in prison

Micah has been a target of the other inmates since his incarceration due to his profound deafness, misshapen appearance, social awkwardness and small stature of 120lbs. For example, when other prisoners try to talk to Micah, if he is not watching them so that he could read their lips, the other prisoners have gotten upset when he did not respond. "This has led to a few incidents that have caused Micah to be moved into protective custody where he is locked up in his cell for up to 23 hours a day" (see attached Exhibit #3, Letter of **Robert Brown**, Father). Likewise, Correctional Officers have also gotten upset with Micah as they expect him to be able to hear announcements from the PA system. When he has failed to obey the command, they have considered this intentional (see attached

Exhibit #3, Letter of **Robert Brown**, Father). There is every reason to believe that this will continue when he is moved to a federal facility.

## C. THE NEED FOR MICAH TO BE SENTENCED TO A FACILITY CLOSE TO HIS HOME IN OREGON.

While the defense recognizes that most of the convicted sexual offenders sentenced in the Northern District of New York are placed at FCI Butner, this facility would be completely inappropriate for Micah as it is unlikely that they will be able to accommodate for his disabilities. A recent lawsuit filed on behalf of two deaf inmates at FCI Butner documents the many ways that this institution fails to provide deaf inmates with necessary communication and auxiliary aids in violation of federal law.[7] Failure to make these accommodations deprives deaf inmates of the ability to take part in institutional disciplinary proceedings and other programs, and renders them unable to communicate with others both within and outside the institution. The lawsuit documents the facility's refusal to provide American Sign Language interpreters during, for example, medical appointments and meetings which inform inmates of the rules and regulations at FCI Butner. As such, deaf inmates are unable to consent to medical treatments or understand their doctors' instructions. Moreover, because they are unfamiliar with the institution's policies, they are frequently subject to disciplinary procedures at which, without an interpreter, they are unable to adequately explain any misunderstandings.

The lawsuit details numerous other ways in which FCI Butner fails to accommodate its deaf inmates. For example, a TTY phone is unavailable to deaf inmates on the same terms as ordinary phones are available to hearing inmates: the phone is located in a locked office, and deaf inmates must request access from two members of the prison staff, who will then dial the relevant phone number. Moreover, deaf inmates cannot hear announcements made over a public address speaker system, and there are no visual alarms or message boards to alert deaf inmates to announcements or

---

[7] *Heyer v. United States Bureau of Prisons, et al.*, Civil Action No. 5:11-cv-3118-D (E.D. N.Car., Raleigh Div.) Complaint filed June 20, 2011.

8

emergencies. Deaf inmates are unable to access goods sold in the commissary because they are handed through a mirrored window, and they cannot interact with the person behind the mirrored window in any fashion.

We ask this Court to consider designating FCI Sheridan in Oregon for Micah to serve his sentence. This facility is close to Micah's home and family. We believe this would be an appropriate facility based on Micah's physical disabilities and his inability to access the telephone as a means of communication. Many persons who know Micah have commented on how dependent he is on his parents. "Because of his disabilities he would often miss social cues or need to have something explained to him. As such, he has always remained strongly dependent on his parents and the rest of his family to give him support and guidance and a sense of social perspective" (see attached Exhibit #9, Letter of **Jerome Rainey**, Uncle). "I have observed situations where, despite his handicaps, Micah is able to learn from his mistakes; specifically if it is his father who is making the suggested corrective action....I cannot imagine how difficult it would be for Micah if he was in an alien prison environment for years without access to his father" (see attached Exhibit #10, Letter of **Mark Brown**, Uncle). Because Micah presents as an unusually vulnerable inmate, it is imperative that he receive family support in the form of visits during his incarceration.

### *D. CONCLUSION*

If this Court were to depart from the recommended sentencing guidelines, such as decision would be in line with other cases in this jurisdiction (and others) in which the Defendants engaged in similar conduct. In *United States v. Dorvee, 616 F 3d 174 (2nd Cir., 2010)*, and *United States v. Shay, No. 10-1543-cr, April 6, 2011*, the Appellate Court vacated and remanded a 223 month sentence imposed under USSG § 2G2.2 finding that the sentence was substantively unreasonable. The Circuit Court reminded the District Court that it is not to presume that the guidelines are presumptively reasonable and that "it is emphatically clear that the Guidelines are guidelines—that is, they are truly advisory" (*Dorvee, id.*, at page 183, internal citations omitted).

Whether the Court arrives at the appropriate sentence through 18 U.S.C. §3553 or through USSG § 5K2.22(2) and USSG § 5H1.4 due to his extraordinary physical impairments, it is evident that because of Micah's extensive physical disabilities as well as his social awkwardness, his prison sentence will be more difficult than the average offender. Counsel submits that a sentence of 10 years in prison and 5 years post-release supervision is sufficient, but no greater than necessary, to comply with the purposes set forth in Paragraph (2) of 18 U.S.C. §3553(a), and respectfully requests that the Court impose such a sentence.

Dated: August 9, 2011

Bianco Law Office

By: _____
Randi Juda Bianco, Esq.
Attorney for Defendant
247 West Fayette Street
Suite 202
Syracuse, New York 13202
(315) 424-0744
Bar Role # 507514